FILED

2020 Mar-31  PM 04:10
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| MATTHEW JOHNSON, Derivatively on Behalf of ADTRAN, INC., | ) Case No. |
| Plaintiff, | ) VERIFIED STOCKHOLDER |
| v. | ) DERIVATIVE COMPLAINT FOR |
| | ) BREACH OF FIDUCIARY DUTY, |
| THOMAS R. STANTON, MICHAEL FOLIANO, H. FENWICK HUSS, BALAN NAIR, KATHRYN A. WALKER, ANTHONY J. MELONE, JACQUELINE H. RICE, GREGORY MCCRAY, ROGER D. SHANNON, and WILLIAM L. MARKS, | ) WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| Defendants, | ) |
| -and- | ) DEMAND FOR JURY TRIAL |
| ADTRAN, INC., a Delaware Corporation, | ) |
| Nominal Defendant. | ) |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel,

which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant ADTRAN, Inc. ("ADTRAN" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in hundreds of millions of dollars in damages to ADTRAN's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed ADTRAN to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      ADTRAN is a global provider of networking and communications equipment for various forms of network infrastructures.  The Company's customers include domestic and international internet and cable companies.

3.      ADTRAN's business depends heavily upon its sales to a limited number of major service providers and large communications companies.  As a result, the Company's success depends upon demand from these customers.  This demand fluctuates significantly.  In order to meet this demand, ADTRAN maintains substantial inventories of raw materials and finished goods that may become

excessive or obsolete.  As a result, the market closely follows the Company's statements regarding these inventories.

4.     From February 28, 2019 to October 9, 2019, the Individual Defendants (as defined herein) made or caused the Company to make a series of improper statements concerning its business and future prospects.  In particular, these fiduciaries represented that ADTRAN's internal controls were effective while reporting its financial results, including excessive and obsolete inventory reserves ("E&O Reserves").  They also assured stockholders that demand from an important Latin American customer would remain strong.

5.     The truth began to emerge on July 17, 2019, as ADTRAN disclosed it was in the process of assessing its current and previously reported E&O Reserves while indicating there may be undisclosed material weaknesses in its internal controls.  On this news, the Company's stock price dropped more than 23%, or $3.69 per share, on July 18, 2019, to close at $12.13 per share compared to the previous trading day's closing of $15.82 per share, erasing $176.4 million in market capitalization in single day.  The decline would have been sharper if the Company's executives had not assured stockholders that demand from an important Latin American customer would remain strong.

6.     On August 12, 2019, the Company confirmed there were material weaknesses in its internal controls relating to the existence and valuation of inventory while disclosing that, as a result, it had misstated its E&O Reserves.

7.     Further disappointment came on October 9, 2019, as ADTRAN announced preliminary financial results that fell far below analysts' expectations. The Company explained that its revenue had been impacted by pauses in shipments to an important Latin American customer, contrary to previous assurances of continuing strong demand from that customer.   Following these disclosures, ADTRAN's stock plunged more than 19%, or $2.10 per share, on October 10, 2019, to close at $8.81 per share, compared to the previous trading day's closing of $10.91 per share, erasing almost $100.4 million in market capitalization in a single day.

8.     As a direct result of the improper statements detailed herein, ADTRAN is now the subject of a federal securities class action lawsuit in the U.S. District Court for the Northern District of Alabama on behalf of investors who purchased ADTRAN's shares (the "Securities Class Action").

## JURISDICTION AND VENUE

9.     Jurisdiction is conferred by 28 U.S.C. §1332.   Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

10.    This Court has jurisdiction over each defendant named herein because

each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because:

(i) ADTRAN maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to ADTRAN, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.     Plaintiff Matthew Johnson was a stockholder of ADTRAN at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current ADTRAN stockholder.  Plaintiff is a citizen of Texas.

**Nominal Defendant**

13.     Nominal Defendant ADTRAN is a Delaware corporation with principal executive offices located at 901 Explorer Boulevard, Huntsville, Alabama. Accordingly, ADTRAN is a citizen of Delaware and Alabama.  ADTRAN is a global provider of networking and communications solutions and services.  The Company operates in two business segments: Network Solutions, which includes hardware and software products, and Services & Support, which includes services that complement the Company's product portfolio.  As of December 31, 2019, ADTRAN had 1,790 employees.

**Defendants**

14.     Defendant Thomas R. Stanton ("Stanton") is ADTRAN's Chairman of the Board of Directors (the "Board") and has been since March 2007, and Chief Executive Officer and a director and has been since September 2005.   Defendant Stanton was also ADTRAN's Senior Vice President and General Manager – Carrier Networks from 2001 to September 2005; Vice President and General Manager – Carrier Networks Division from 1999 to 2001; and Vice President – Carrier Networks Marketing from 1995 to 1999.  Defendant Stanton is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.  Defendant Stanton knowingly, recklessly,

or with gross negligence made improper statements in the Company's press releases and public filings concerning ADTRAN's: (i) internal controls; (ii) financial statements and E&O Reserves; (iii) demand from an important Latin American customer; and (iv) business and future prospects.  Defendant Stanton is a citizen of Alabama.

15.     Defendant Michael Foliano ("Foliano") is ADTRAN's Chief Financial Officer and Senior Vice President of Finance and has been since March 2019; Corporate Secretary and has been since at least April 2019; and Treasurer and has been since at least February 2020.   Defendant Foliano was also ADTRAN's Senior Vice President Operations from 2006 to March 2019, and Interim Chief Financial Officer, Treasurer and Secretary from March 2015 to November 2015.   Defendant Foliano is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Defendant Foliano knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning ADTRAN's: (i) internal controls; (ii) financial statements and E&O Reserves; (iii) demand from an important Latin American customer; and (iv) business and future prospects.  Defendant Foliano is a citizen of Alabama.

16.     Defendant H. Fenwick Huss ("Huss") is ADTRAN's Lead Director and has been since May 2015, and a director and has been since October 2002.

Defendant Huss is the Chair of ADTRAN's Audit Committee and has been since May 2019, and a member of that committee and has been since at least April 2018. Defendant Huss knowingly, in bad faith, or in conscious disregard for his duties caused or allowed ADTRAN to make improper statements its press releases and public filings concerning the Company's: (i) internal controls; (ii) financial statements and E&O Reserves; (iii) demand from an important Latin American customer; and (iv) business and future prospects.  Defendant Huss is a citizen of Georgia.

17.     Defendant Balan Nair ("Nair") is an ADTRAN director and has been since May 2007.  Defendant Nair knowingly, in bad faith, or in conscious disregard for his duties caused or allowed ADTRAN to make improper statements its press releases and public filings concerning the Company's: (i) internal controls; (ii) financial statements and E&O Reserves; (iii) demand from an important Latin American customer; and (iv) business and future prospects.  Defendant Nair is a citizen of Colorado.

18.     Defendant Kathryn A. Walker ("Walker") is an ADTRAN director and has been since May 2014.  Defendant Walker knowingly, in bad faith, or in conscious disregard for her duties caused or allowed ADTRAN to make improper statements its press releases and public filings concerning the Company's: (i) internal controls; (ii) financial statements and E&O Reserves; (iii) demand from an

important Latin American customer; and (iv) business and future prospects. Defendant Walker is a citizen of Kansas.

19.     Defendant Anthony J. Melone ("Melone") is an ADTRAN director and has been since February 2016.  Defendant Melone is a member of ADTRAN's Audit Committee and has been since at least April 2018.  Defendant Melone knowingly, in bad faith, or in conscious disregard for his duties caused or allowed ADTRAN to make improper statements its press releases and public filings concerning the Company's: (i) internal controls; (ii) financial statements and E&O Reserves; (iii) demand from an important Latin American customer; and (iv) business and future prospects.  Defendant Melone is a citizen of New Jersey.

20.     Defendant Jacqueline H. Rice ("Rice") is an ADTRAN director and has been since August 2016.    Defendant Rice is a member of ADTRAN's Audit Committee and has been since at least April 2018.  Defendant Rice knowingly, in bad faith, or in conscious disregard for her duties caused or allowed ADTRAN to make improper statements its press releases and public filings concerning the Company's: (i) internal controls; (ii) financial statements and E&O Reserves; (iii) demand from an important Latin American customer; and (iv) business and future prospects.  Defendant Rice is a citizen of Michigan.

21.     Defendant Gregory McCray ("McCray") is an ADTRAN director and has been since May 2017.   Defendant McCray is a member of ADTRAN's Audit

Committee and has been since at least April 2018.  Defendant McCray knowingly, in bad faith, or in conscious disregard for his duties caused or allowed ADTRAN to make improper statements its press releases and public filings concerning the Company's: (i) internal controls; (ii) financial statements and E&O Reserves; (iii) demand from an important Latin American customer; and (iv) business and future prospects.  Defendant McCray is a citizen of Illinois.

22.    Defendant Roger D. Shannon ("Shannon") was ADTRAN's Vice President of Treasury and Corporate Development from March 2019 to July 2019, and Chief Financial Officer, Senior Vice President of Finance, Corporate Treasurer, and Secretary from November 2015 to March 2019.   Defendant Shannon is named as a defendant in the related Securities Class Action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.  Defendant Shannon knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning ADTRAN's: (i) internal controls; (ii) financial statements and E&O Reserves; (iii) demand from an important Latin American customer; and (iv) business and future prospects.  Defendant Shannon is a citizen of Alabama.

23.    Defendant William L. Marks ("Marks") was an ADTRAN director from 1993 to May 2019.  Defendant Marks was also the Chair of ADTRAN's Audit Committee from at least April 2018 to May 2019.  Defendant Marks knowingly, in

bad faith, or in conscious disregard for his duties caused or allowed ADTRAN to make improper statements its press releases and public filings concerning the Company's: (i) internal controls; (ii) financial statements and E&O Reserves; (iii) demand from an important Latin American customer; and (iv) business and future prospects.  Defendant Marks is a citizen of Louisiana.

24.     The defendants identified in ¶¶14-15, 22 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶14, 16-21, 23 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶16, 19-21, 23 are referred to herein as the "Audit Committee Defendants."  Collectively, the defendants identified in ¶¶14-23 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

25.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe ADTRAN and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage ADTRAN in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of ADTRAN and not in furtherance of their personal interest or benefit.

26.     To discharge their duties, the officers and directors of ADTRAN were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of ADTRAN were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time;

(c)     conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock; and

(d)     remain informed as to how ADTRAN conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

27.    Further, under the Company's Corporate Governance Principles, the Board had an obligation to "[m]onitor the financial position and operating results of the Company."

**Additional Duties of the Audit Committee Defendants**

28.    In addition to these duties, under the Audit Committee Charter, the Audit Committee Defendants, defendants Huss, Melone, Rice, McCray, and Marks, owed specific duties to ADTRAN to assist the Board in overseeing the Company's: (i) financial reports and other financial information provided to the public or any governmental body; (ii) compliance with legal and regulatory requirements; (iii) systems of internal controls; and (iv) auditing, accounting, and financial reporting processes generally.   Pursuant to the Charter and in order "[t]o fulfill its responsibilities and duties" the Audit Committee was required to undertake a number of actions relating to "Document/Report Review," "Financial Reporting Processes," "Process Improvement," and "Legal Compliance."

29.    With respect to "Document/Report Review," the Audit Committee was required to review "any reports or other financial information submitted to any governmental body, or the public."   The Audit Committee was also required to review with financial management "each Form 10-Q and Form 10-K prior to their filing."  The Charter further imposed an obligation on the Audit Committee to review the reports of the independent auditors, and to review with management the

Company's systems of internal controls.  In particular, the Charter states:

- ***Review any reports or other financial information submitted to any governmental body, or the public***, including any certification, report, opinion, or review rendered by the independent auditors.

- Review the regular internal reports to management prepared by the internal auditing department and management's response.

- ***Review with financial management and the independent auditors each Form 10-Q and Form 10-K prior to their filing***.

- Discuss with the independent auditors at least annually their internal quality-control procedures and any material issues raised by the most recent peer review.

*      *      *

- Review a report of the independent auditors prior to the filing of the Form 10-K or the release of any audited financial statements of the Company with respect to:

  o  all critical accounting policies and practices used;

  o  all alternative treatments of financial information within generally accepted accounting principles (GAAP) that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor; and

  o  other material written communications between the independent auditors and management, such as any management letter or schedule of unadjusted differences.

- ***Review with management***, including both the Chief Executive Officer and Chief Financial Officer: (i) ***on a quarterly basis, the report of the Disclosure Controls Committee and the internal control system***, and (ii) ***on an annual basis, the internal control report to be filed with the Company's annual report on Form 10-K***.

30.     With respect to "Financial Reporting Processes" the Audit Committee was required to: (i) discuss the Company's annual and quarterly financial statements with management and the independent auditors; (ii) "[d]iscuss earnings press releases, as well as financial information and earnings guidance provided to analysts"; (iii) "review the integrity of the Company's internal and external financial reporting processes" in consultation with the independent and internal auditors; and (iv) "[c]onsider the independent auditors' judgments about the quality and appropriateness of the Company's accounting principles," and approve any recommended changes to the Company's accounting principles and practices.

31.     With respect to "Process Improvement" the Charter imposed an obligation on the Audit Committee to: (i) establish separate systems of reporting to the Committee by management, the independent auditors, and the internal auditors regarding the appropriateness of judgments management made in preparing financial statements; (ii) review separately with management, the independent auditors, and the internal auditing department any problems or difficulties that arose during the annual audit; and (iii) annually review and monitor compliance with the Company's Code of Conduct.

32.     With respect to "Legal Compliance" the Audit Committee was required to review "any legal matter that could have a significant impact on the Company's financial statements and compliance programs and policies" and "[r]eview and

discuss the Company's risk assessment and risk management policies."

**Breaches of Duties**

33.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of ADTRAN, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

34.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to operate with material weaknesses in its internal controls and disseminate a series of unlawful statements to the public.  These improper practices wasted the Company's assets, and caused ADTRAN to incur substantial damage.

35.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of ADTRAN, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, ADTRAN has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING,
## AND CONCERTED ACTION

36.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

37.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of ADTRAN, regarding the Individual Defendants' management of ADTRAN's operations; and (ii) enhance the Individual Defendants' executive and directorial positions at ADTRAN and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

38.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

39.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

40.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.   Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

41.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## COMPANY BACKGROUND

42.     ADTRAN provides networking and communications equipment for a variety of network infrastructures.   The Company services a domestic and international customer base that includes Tier 1, 2, and 3 communications service providers, cable companies, and distributed entities.[1]

43.     ADTRAN's business depends heavily on sales to certain customers, in particular major service providers and larger independent communications companies.   These customers have historically comprised over half of ADTRAN's revenues.   Accordingly, the Company acknowledges its future success depends upon demand from these customers and other factors outside its control while warning reductions, delays, and fluctuations in sales to any such customer could have a material adverse impact on its business and future financial results.   Specifically, in its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "2018 Form 10-K"), filed with the SEC on February 28, 2019, ADTRAN stated:

> As long as the major and larger independent communications companies represent such a substantial percentage of our total sales, our future success will significantly depend upon certain factors which are not within our control, including:

---

[1] The Internet is comprised of several service providers that are categorized hierarchically.  Tier 1 providers form the backbone of the Internet and exchange free access and information with other Tier 1 providers.  Tier 2 providers connect between Tier 1 and 3 providers, oftentimes for a fee. Examples of Tier 1 service providers include AT&T Inc. and CenturyLink, Inc. ("CenturyLink").

- the timing and size of future purchase orders, if any, from these customers;

- changes in strategic plans and capital budgets of these customers; [and]

- the product requirements of these customers[.]

*      *      *

In the past, sales to our large customers have fluctuated, and may fluctuate in the future, significantly from quarter to quarter and year to year. The loss of, or a significant reduction or delay in, sales to any such customer or the occurrence of sales fluctuations could have a material adverse effect on our business and results of operations.

44.    The Company's most important customers in terms of revenue have included CenturyLink, a domestic Tier 1 service provider, and Deutsche Telekom, AG ("Deutsche Telekom"), a German Tier 1 service provider.  In 2017, CenturyLink and Deutsche Telekom comprised 40% and 16% of ADTRAN's revenues, respectively.   In 2018, those two customers comprised 17% and 27% of the Company's revenues, respectively.

45.    In 2019, the list of individual customers comprising over 10% of ADTRAN's revenues expanded to three to include Telmex, a Mexican Tier 1 service provider.  Telmex had not been a significant customer before then.  In fact, in 2018, the Company derived less than 3% of its total sales from the entire Mexico region.

46.    To meet unpredictable demand from customers, ADTRAN maintains substantial inventories of raw materials and finished goods.[2]  This practice increases the amount of inventory that may become excessive or obsolete and require the Company to write down the value of its inventory.  The Company establishes E&O Reserves equal to the difference between the cost of inventory and the estimated fair value of the inventory based upon assumptions about future demand, market conditions, and life.  Disposals of inventory are charged against the E&O Reserves.

## IMPROPER STATEMENTS

47.    From February 28, 2019 to October 9, 2019, the Individual Defendants made or caused the Company to make a series of improper statements concerning its business and future prospects.  In particular, these fiduciaries represented that ADTRAN's internal controls were effective while reporting its financial results and E&O Reserves.  They also assured stockholders that demand from an important Latin American customer, Telmex, would remain strong.

48.    On February 28, 2019, ADTRAN filed the 2018 Form 10-K with the SEC.  In the 2018 Form 10-K, ADTRAN reported total sales of $529.2 million and an operating loss of $45.4 million.

---

[2] Examples of these raw materials and finished goods include fiber-, copper- and coaxial-based infrastructures, pluggable optical transceivers, cables, circuit boards, and other miscellaneous materials.

49.     The 2018 Form 10-K also reported the Company's reserve for excess and obsolete inventory, stating that the figure was "$30.0 million and $23.4 million at December 31, 2018 and 2017, respectively."  In particular, the 2018 Form 10-K stated:

> We maintain substantial inventories of raw materials for long lead-time components to support this demand and avoid expedite fees. We also maintain substantial finished goods inventories. Our practice of maintaining sufficient inventory levels to assure prompt delivery of our products and services increases the amount of inventory that may become obsolete. The obsolescence of this inventory may require us to write down the value of the obsolete inventory, which may have an adverse effect on our operating results.

> *       *       *

> **Inventory**

> We carry our inventory at the lower of cost and net realizable value, with cost being determined using the first-in, first-out method. We use standard costs for material, labor, and manufacturing overhead to value our inventory. Our standard costs are updated on at least a quarterly basis and any variances are expensed in the current period; therefore, our inventory costs approximate actual costs at the end of each reporting period. We write down our inventory for estimated obsolescence or unmarketable inventory by an amount equal to the difference between the cost of inventory and the estimated fair value based upon assumptions about future demand and market conditions. If actual future demand or market conditions are less favorable than those projected by management, we may be required to make additional inventory write-downs. ***Our reserve for excess and obsolete inventory was $30.0 million and $23.4 million at December 31, 2018 and 2017, respectively***. Inventory disposals charged against the reserve were $0.4 million, $8.3 million and $4.7 million for the years ended December 31, 2018, 2017 and 2016, respectively.

50.     Defendants Stanton, Huss, Nair, Walker, Melone, Rice, McCray, Shannon, and Marks each signed the 2018 Form 10-K.[3]  In addition, the report included the signed certifications of defendants Stanton and Shannon pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") attesting to the accuracy of financial reporting, the disclosure of any material changes to ADTRAN's internal controls, and the disclosure of all fraud.  The 2018 Form 10-K also assured stockholders that ADTRAN's internal controls were effective as of December 31, 2018.

51.     On April 17, 2019, the Company issued a press release announcing its results for the first quarter of 2019.  In the press release, ADTRAN reported sales of $143.8 million compared to sales of $120.8 million for the first quarter of 2018.  The Company also reported net income of $0.8 million compared to a net loss of $10.8 million for the first quarter of 2018.  In the press release, defendant Stanton touted ADTRAN's "progress" and "well balanced" revenue derived from regions including Latin America (LATAM), Europe, the Middle East, and Asia (EMEA), North America, and the Pacific Rim.  He further conveyed this progress would persist, as the Company's "next-generation solutions continue[] to gain market traction with a growing number of customers in an expanding range of market segments."

---

[3] Defendants Huss, Nair, Walker, Melone, Rice, McCray, and Marks signed the 2018 Form 10-K by defendant Shannon as Attorney in Fact.

52.     On May 7, 2019, ADTRAN filed its Quarterly Report on Form 10-Q for the first quarter ended March 31, 2019 (the "Q1 2019 Form 10-Q") with the SEC. The Q1 2019 Form 10-Q affirmed and reiterated the sales and net income figures previously reported by the Company.  The Q1 2019 Form 10-Q also reported that "[a]t March 31, 2019 and December 31, 2018, raw materials reserves totaled $17.1 million and $17.6 million, respectively, and finished goods inventory reserves totaled $12.8 million and $12.4 million, respectively."

53.     The Q1 2019 Form 10-Q assured stockholders that ADTRAN's internal controls were effective as of March 31, 2019.  In addition, the report included the signed certifications of defendants Stanton and Foliano pursuant to SOX attesting to the accuracy of financial reporting, the disclosure of any material changes to ADTRAN's internal controls, and the disclosure of all fraud.

### THE IMPROPER STATEMENTS CONTINUE AS THE TRUTH SLOWLY EMERGES

54.     The truth about the Company's internal control deficiencies and errors in reporting E&O Reserves began to emerge on July 17, 2019, as ADTRAN issued a press release announcing "preliminary" results for the second quarter of 2019.  The press release disclosed that ADTRAN was in the process of assessing its current and previously reported E&O Reserves.  Depending on this "ongoing assessment," the press release warned that the Company might need to correct its current and

previously stated financial results.   ADTRAN also revealed the possibility of material weaknesses in its internal controls.  In particular, the press release stated:

Preliminary Financial Results

The Company's reported results for the quarter and year to date ended June 30, 2019 are preliminary due to the Company's ongoing assessment of the reasonableness of its current and previously reported excess and obsolete inventory reserves ("E&O reserves"). The Company is working diligently to finalize its assessment and evaluate the materiality of adjustments to the reserve, if any, and determine the appropriate method of correction to its current and previously reported financial results, as necessary. In addition to assessing the reasonableness of its E&O reserves, the Company is also assessing inventory related internal control deficiencies which may result in the identification of material weaknesses. If material changes to our preliminary results do occur, an updated press release will be issued.

Quarterly Results

For the quarter, revenue was $156.4 million compared to $128.0 million for the second quarter of 2018. Net income is estimated to be $5.1 million compared to a net loss of $7.7 million for the second quarter of 2018. Earnings per share, assuming dilution, is estimated to be $0.11 compared to a loss per share of $0.16 for the second quarter of 2018. Non-GAAP net income is estimated to be $6.9 million compared to a net loss of $4.6 million for the second quarter of 2018. Non-GAAP earnings per share, assuming dilution, is estimated to be $0.14 compared to a loss per share of $0.10 for the second quarter of 2018. Non-GAAP earnings per share exclude stock-based compensation expense, acquisition related amortizations and other expenses, restructuring expenses, gain on bargain purchase of a business or other contingencies, amortization of pension actuarial losses, and a reimbursement from a claim settlement. The reconciliation between GAAP net income (loss) and earnings (loss) per share to non-GAAP net income (loss) and non-GAAP earnings (loss) per share is in the table provided.

55.     Despite this announcement and the inherent uncertainty of ADTRAN's actual financial position, defendant Stanton commented in the press assuring stockholders of the Company's "sustained progress" and "solid performance." Specifically, defendant Stanton stated:

> ***We are pleased with our continued progress and solid performance*** for the second quarter of 2019. Revenue for the quarter grew 22% year-over-year and 9% over the previous quarter. Our execution continues to be strong across North America, LATAM, EMEA, and the Pacific Rim with diverse and well-balanced material revenue contributions from each of these regions. This ***sustained progress*** underscores the Company's global impact as we help our customers build their best networks.

56.     Following this press release, ADTRAN's market capitalization dropped more than 23%, or $3.69 per share, on July 18, 2019, to close at $12.13 per share compared to the previous trading day's closing of $15.82 per share, erasing $176.4 million in market capitalization in a single day.

57.     On July 18, 2019, ADTRAN held an earnings conference call with analysts and investors to discuss its results for the second quarter of 2019.  During the call, an analyst pointed out that the Company's recently large Latin American customer had "been strong now for a couple quarters in a row," and that "it didn't sound like there was anything in [ADTRAN's executives'] comments to suggest they're slowing."  The analyst then asked "how things look in Latin America for the second half of th[e] year," noting that the major customer in that region "ha[d] been historically kind of an on and off again customer."  In response, defendant Stanton

conveyed the Company would continue to receive significant demand from the customer.  In particular, defendant Stanton stated:

> Well, our history with that customer would tell you that they are different in the way that they plan their demand but they have a goal of – a specific goal of VDSL Vectored footprint expansion.  I would tell you that they are not to that goal.  They have to buy significantly more amount of material in order to meet that, which is their first phase goal.  So we're just continuing to operate with them and try and meet their demand and their time lines and things like that.

58.   On August 12, 2019, ADTRAN filed a Notification of Late Filing on Form 12b-25 with the SEC announcing it was unable to timely file its quarterly financial report.  The Company disclosed that its management and the Audit Committee had identified two material weaknesses in its internal controls that existed as of December 31, 2018, and that continued through the end of the second quarter of 2019.  In particular, ADTRAN failed to "design and maintain effective internal control over certain aspects of its valuation and existence of inventory." Specifically, the Company announced:

> ADTRAN, Inc. (the "Company") is unable, without unreasonable effort or expense, to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019 ("Q2 Form 10-Q") with the Securities and Exchange Commission (the "SEC") within the prescribed time period. The Company requires additional time to compile the information necessary to prepare a complete and accurate Q2 Form 10-Q due to the Company's ongoing assessment of the accuracy and reasonableness of its current and previously reported excess and obsolete inventory reserves ("E&O Reserves").

> On August 8, 2019, subsequent to the issuance of the Company's Annual Report on Form 10-K for the year ended December 31, 2018

("2018 Form 10-K"), the Company's management, in consultation with the Audit Committee of the Board of Directors, concluded that there were two material weaknesses related to internal control deficiencies that existed as of December 31, 2018 and that continued through the end of the second quarter of 2019. Specifically, the Company's management has determined that the Company did not, as of December 31, 2018 and through June 30, 2019, design and maintain effective internal control over certain aspects of its valuation and existence of inventory. As a result, Management's Report on Internal Control Over Financial Reporting included in Item 9A of the 2018 Form 10-K and the opinion of PricewaterhouseCoopers LLP ("PwC") relating to the effectiveness of the Company's internal control over financial reporting as of December 31, 2018 included in the 2018 Form 10-K should no longer be relied upon. Additionally, the statements within "*Evaluation of disclosure controls and procedures*" included in Part II, Item 9A of the 2018 Form 10-K regarding the effectiveness of the Company's disclosure controls and procedures for the period presented are no longer accurate due to the material weaknesses described above. The Company has determined to prepare and file an amendment to the 2018 Form 10-K (the "Form 10-K/A") in order to address the material weaknesses and related disclosures.

59.    ADTRAN further disclosed that these material weaknesses resulted in a misstatement of its previously reported E&O Reserves. Specifically, the Company stated:

> Although the identified material weaknesses did result in a misstatement of the Company's previously reported E&O Reserves, management of the Company currently believes that such misstatements did not result in a material misstatement of the Company's previously issued financial statements. However, the Company has not yet completed its assessment and, therefore, is unable to affirmatively conclude at this time that the completion of such assessment will not result in a material misstatement of its previously issued financial statements or that the out-of-period correction of such misstatement would not be material to the Company's financial results for the three and six months ended June 30, 2019 or forecasted 2019 financial results.

60.     On September 20, 2019, ADTRAN filed its Quarterly Report on Form 10-Q for the second quarter ended June 30, 2019 (the "Q2 2019 Form 10-Q") with the SEC.  The Q2 2019 Form 10-Q reported sales of $156.3 million and net income of $3.9 million.   ADTRAN also revealed that in order to correct the previously disclosed misstatements in excess and obsolete inventory, it recognized a $0.8 million out-of-period adjustment, which increased its E&O Reserves for the period. Specifically the Q2 2019 Form 10-Q stated:

*Correction of Immaterial Misstatements.*

During the three months ended June 30, 2019, the Company determined that there was an immaterial misstatement of its excess and obsolete inventory reserves in its previously issued annual and interim financial statements. The Company corrected this misstatement by recognizing a $0.8 million out-of-period adjustment during the three months ended June 30, 2019, which increased its excess and obsolete inventory reserve and cost of goods sold for the period. For the six months ended June 30, 2019, the out-of-period adjustment was a cumulative $0.2 million reduction in its excess and obsolete inventory reserve and cost of goods sold. In addition, the Company determined that a $1.0 million cash inflow related to an insurance recovery was incorrectly classified as a cash flow from operations instead of a cash flow from investing activities within the unaudited Condensed Consolidated Statement of Cash Flows for the three months ended March 31, 2019. The accompanying Unaudited Condensed Consolidated Statement of Cash Flows for the six months ended June 30, 2019 correctly reflects the $1.0 million insurance recovery as a cash inflow from investing activities. Management has determined that these misstatements were not material to any of its previously issued financial statements and that correction of the misstatements is also not material to the current or estimated annual 2019 financial results on both a quantitative and qualitative basis.

61.    On October 9, 2019, the Company issued a press release announcing preliminary estimates for certain of its financial results for the third quarter ended September 30, 2019.  The press release disclosed ADTRAN expected revenue of approximately $114 million for the quarter, far below analyst estimates of $140.2 million.  The Company further disclosed that it expected earnings per share to be a loss of approximately $0.96 per share, or an adjusted loss of $0.06 per share. Analysts were expecting $0.03 per share in adjusted profit.  In the press release, defendant Stanton explained the shortfall resulted from "a pause in shipments to a Tier 1 customer in Latin America and the continued slowdown in the spending at an international Tier 1 customer."  In particular, the press release stated:

> Based upon preliminary information, revenue for the quarter is expected to be approximately $114 million. Earnings per share for the quarter, assuming dilution, is expected to be a loss of approximately $0.96. Non-GAAP earnings per share for the quarter, assuming dilution, is expected to be a loss of approximately $0.06. Earnings per share is expected to be affected by a one-time, non-cash, valuation allowance of approximately $37 million, that will be recorded to income tax expense in the Company's consolidated income statement to reduce the carrying value of the Company's deferred tax assets.

> ADTRAN Chief Executive Officer Tom Stanton stated, "Our revenue this quarter has been significantly impacted by a pause in shipments to a Tier 1 customer in Latin America and the continued slowdown in the spending at an international Tier 1 customer. With the exception of these two large customers, revenues generated from the rest of our business grew 20% over the previous quarter. Although we expect our Latin American customer sales to rebound, our current visibility regarding timing is limited. For the international Tier 1 customer, we expect that sales should resume with the new capital cycle in 2020."

Our current expectation for revenue for the fourth quarter of 2019, is that it will be flat to slightly down from the third quarter. Additionally, we plan for our non-GAAP operating expenses during the fourth quarter to be approximately 10% below our second quarter non-GAAP expense rate.

62.     On this news, ADTRAN's market capitalization plunged more than 19%, or $2.10 per share, on October 10, 2019, to close at $8.81 per share, compared to the previous trading day's closing of $10.91 per share, erasing almost $100.4 million in market capitalization in a single day.

## REASONS THE STATEMENTS WERE IMPROPER

63.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     there were material weaknesses in ADTRAN's internal controls relating to its valuation and existence of inventory;

(b)     the Company had misstated its financial statements by improperly reporting its E&O Reserves;

(c)     ADTRAN was going to pause shipments to a major Latin American customer; and

(d)     as a result of the foregoing, ADTRAN's representations concerning its business and future prospects were improper.

## **DAMAGES TO ADTRAN**

64.     As a result of the Individual Defendants' improprieties, ADTRAN disseminated improper, public statements concerning its internal controls, excess and obsolete inventory, and business and future prospects.   These improper statements have devastated ADTRAN's credibility as reflected by the Company's almost $428 million, or 50%, market capitalization loss from its April 2019 high to its October 2019 low.

65.     ADTRAN's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, ADTRAN's current and potential customers consider a company's ability to accurately value its business prospects and evaluate sales and growth potential.  Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions.  ADTRAN's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

66.     Further, as a direct and proximate result of the Individual Defendants' actions, ADTRAN has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any adverse judgment or settlement in the Securities Class Action for violations of federal securities laws;

(b)     costs incurred from assessing the Company's E&O Reserves and revisiting its previous financial statements; and

(c)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to ADTRAN.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

67.     Plaintiff brings this action derivatively in the right and for the benefit of ADTRAN to redress injuries suffered, and to be suffered, by ADTRAN as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  ADTRAN is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

68.     Plaintiff will adequately and fairly represent the interests of ADTRAN in enforcing and prosecuting its rights.

69.     Plaintiff was a stockholder of ADTRAN at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current ADTRAN stockholder.

70.     The current Board of ADTRAN consists of the following seven individuals: defendants Stanton, Huss, Nair, Walker, Melone, Rice, and McCray.

Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Stanton, Huss, Nair, Walker, Melone, Rice, and McCray Face a Substantial Likelihood of Liability for Their Misconduct**

71.    As alleged above, defendants Stanton, Huss, Nair, Walker, Melone, Rice, and McCray breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding ADTRAN's: (i) internal controls; (ii) financial statements and E&O Reserves; (iii) demand from an important Latin American customer; and (iv) business and future prospects. Defendants Stanton, Huss, Nair, Walker, Melone, Rice, and McCray each signed the 2018 Form 10-K containing the improper statements alleged above.  Defendant Stanton also personally made the improper statements detailed above during the Company's earnings conference calls.   Accordingly, demand is futile upon defendants Stanton, Huss, Nair, Walker, Melone, Rice, and McCray.

72.    Defendants Huss, Melone, Rice, and McCray, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance. The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.   It further charges the Audit Committee with overseeing and reviewing the Company's financial statements and

disclosures, systems of internal controls, and the internal controls report to be filed in ADTRAN's Annual Reports on Form 10-K.   Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's internal controls, financial statements, E&O Reserves, and future prospects.   Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.   Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.   Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.   Thus, defendants Huss, Melone, Rice, and McCray face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

73.   Any suit by the current directors of ADTRAN to remedy these wrongs would expose defendants Stanton, Foliano, and Shannon, and ADTRAN to liability for violations of the federal securities laws in the pending Securities Class Action, and would result in civil actions being filed against one or more of the other Individual Defendants.   The Securities Class Action alleges violations of sections 10(b) and 20(a) of the Exchange Act.   If the Board elects for the Company to press forward with its right of action against defendants Stanton, Foliano, and Shannon in

this action, then ADTRAN's efforts would compromise its defense of the Securities Class Action. Accordingly, demand on the Board is excused.

74.    The principal professional occupation of defendant Stanton is his employment with ADTRAN, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits as alleged above. Accordingly, defendant Stanton lacks independence from defendants Huss, Nair, Walker, Melone, Rice, and McCray due to his interest in maintaining his executive position at ADTRAN. This lack of independence renders defendant Stanton incapable of impartially considering a demand to commence and vigorously prosecute this action. Defendant Stanton is incapable of impartially considering a demand to commence and vigorously prosecute this action because he has an interest in maintaining his principal occupation and the substantial compensation he receives in connection with that occupation. Demand is futile as to defendant Stanton.

75.    Plaintiff has not made any demand on the other stockholders of ADTRAN  to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)    ADTRAN is a publicly held company with over forty-eight million shares outstanding and thousands of stockholders as of February 21, 2020;

(b)     making demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)     making demand on all stockholders would force plaintiff to incur excessive expenses, assuming all stockholders could be individually identified.

## COUNT I
### Against the Individual Defendants for Breach of Fiduciary Duty

76.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

77.     The Individual Defendants owed and owe ADTRAN fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe ADTRAN the highest obligation of good faith, fair dealing, loyalty, and due care.

78.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within ADTRAN, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

79.     The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly

negligent in not knowing: (i) there were material weaknesses in ADTRAN's internal controls; (ii) the Company had misstated its financial statements by improperly reporting its E&O Reserves; (iii) ADTRAN was going to pause shipments to a major Latin American customer; and (iv) as a result of the foregoing, ADTRAN's representations concerning its business and future prospects were improper. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

80.    The Director Defendants, as directors of the Company, owed ADTRAN the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.  The Director Defendants knew or were reckless in not knowing that: (i) there were material weaknesses in ADTRAN's internal controls; (ii) the Company had misstated its financial statements by improperly reporting its E&O Reserves; (iii) ADTRAN was going to pause shipments to a major Latin American customer; and (iv) as a result of the foregoing, ADTRAN's representations concerning its business and future prospects were improper.  Accordingly, these defendants breached their duty of loyalty to the Company.

81.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing

contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

82.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, ADTRAN has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

83.     Plaintiff, on behalf of ADTRAN, has no adequate remedy at law.

<u>**COUNT II**</u>
**Against the Individual Defendants for Waste of Corporate Assets**

84.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

85.     As a result of the wrongdoing detailed herein, the Individual Defendants have wasted corporate assets by forcing the Company to expend valuable resources in defending itself in the Securities Class Action that they brought on with their improper statements.

86.     As a result of their failure to conduct proper supervision, the Individual Defendants have caused ADTRAN to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

87.     As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

88.     Plaintiff, on behalf of ADTRAN, has no adequate remedy at law.

## COUNT III
### Against the Individual Defendants for Unjust Enrichment

89.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of ADTRAN.   The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to ADTRAN.

91.     Plaintiff, as a stockholder and representative of ADTRAN, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

92.     Plaintiff, on behalf of ADTRAN, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff, on behalf of ADTRAN, demands judgment as follows:

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing ADTRAN to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect ADTRAN and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over financial reporting;

2.      a proposal to strengthen ADTRAN's oversight of its disclosure procedures;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board; and

4.      a provision to permit the stockholders of ADTRAN to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of ADTRAN has an effective remedy;

D.      Awarding to ADTRAN restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: March 31, 2020                **WHATLEY KALLAS, LLP**

*/s/ W. Tucker Brown*
JOE R. WHATLEY JR.
W. TUCKER BROWN
2001 Park Place North

1000 Park Place Tower
P.O. Box 10968
Birmingham, AL 35203
Telephone: (205) 488-1200
Facsimile:  (800) 922-4851
E-mail: jwhatley@whatleykallas.com
       tbrown@whatleykallas.com

ROBBINS LLP
BRIAN J. ROBBINS
CRAIG W. SMITH
SHANE P. SANDERS
ERIC M. CARRINO
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsllp.com
       csmith@robbinsllp.com
       ssanders@robbinsllp.com
       ecarrino@robbinsllp.com

Attorneys for Plaintiff